Suffolk, ss.                                    Boston, Massachusetts
                                                June 22, 2004

## AFFIDAVIT OF TASK FORCE AGENT SHAWN A. MURRAY

**I, Task Force Agent Shawn A. Murray, depose and state as follows:**

1. I am a Massachusetts State Police ("MSP") Officer as well as a Task Force Agent deputized by the Drug Enforcement Administration ("DEA") pursuant to 21 U.S.C. § 878. From June 1989 until March 2001, I was assigned to the Suffolk County District Attorney's Office narcotics unit. From March 2001 to the present, I have been assigned to the DEA Transportation Task Force at Logan Airport in Boston, Massachusetts.

2. I have received training in the field of narcotics identification and investigation from the MSP, the DEA, the Suffolk District Attorney's Office, the Bureau of Alcohol, Tobacco and Firearms, and from outside instructors. This training has included specialized courses on drug transportation and interdiction, including package interdiction and shipping methods, as well as on methamphetamine production and trafficking.

3. During my career as a law enforcement officer I have participated in hundreds of investigations involving violations of the Massachusetts and federal controlled substances laws. These investigations have utilized various investigatory tools and techniques, including confidential informants, cooperating witnesses, physical surveillance, search warrants, telephone toll

analysis, electronic surveillance, and witness interviews.

4.  Based upon my training and experience and my consultations with other trained and experienced law enforcement agents, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Among other things, I am familiar with: the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, and other means to facilitate their illegal activities; the vernacular of users and distributors of controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and operations; and the typical price, packaging, and method of sale of narcotics in eastern Massachusetts.

5.  I submit this affidavit in support of a complaint charging NURIA SOLE with conspiracy to distribute, and to possess with intent to distribute, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and Gamma Butyrolactone (GBL), a Schedule I controlled substance analogue intended for human consumption, in violation of 21 U.S.C. §§ 846 and 841(a)(1).[1]

---

[1] On February 18, 2000, Congress enacted the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act, which directed that Gamma Hydroxybutyric Acid (GHB) be scheduled as a

6.  The information contained in this affidavit is based on my own observations or has been related to me by law enforcement officers involved in the investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that I believe are necessary and sufficient to establish probable cause to charge SOLE with a violation of 21 U.S.C. §§ 846 & 841.

7.  SOLE lives at 76 Waltham Street, Boston, Massachusetts. Until recently, she was employed as a researcher at Advanced Biosystems, 15 Deangelo Drive, Bedford, Massachusetts. During the course of this investigation, surveillance agents observed SOLE and her car at both locations on several occasions.

8.  I have received information about SOLE from a cooperating witness ("CW-1") who has previously provided reliable information to me and other law enforcement officers. CW-1's previously-provided information has contributed to the arrest and

---

controlled substance.  Pub. L. 106-172, § 3(a), Feb. 18, 2000, 114 Stat. 8; 21 U.S.C. § 812 note. Congress found "that the abuse of illicit [GHB] is an imminent hazard to the public safety" and that GHB is increasingly present in "driving under the influence, sexual assault, and overdose cases especially at night clubs and parties." Id.  Congress also found that "common industrial chemicals such as gamma butyrolactone and 1.4-butanediol are swiftly converted by the body into GHB" and that "illicit use of these and other GHB analogues and precursor chemicals is a significant and growing law enforcement problem." Id.  Pursuant to 21 U.S.C. § 813, "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I."

indictment of two individuals on federal drug trafficking charges. CW-1 has prior convictions as well as a pending federal drug trafficking case and is cooperating in the hope of obtaining a reduced sentence. CW-1 also has used, and is familiar with, a variety of illegal drugs, including methamphetamine, Gamma Hydroxy Butyrate ("GHB"), and GBL.

9. CW-1 told me that he/she first met SOLE in approximately December 2003. CW-1 had been told by one of his/her own methamphetamine customers that SOLE would sometimes test methamphetamine for that customer; after CW-1 was introduced to SOLE, SOLE started testing and purifying methamphetamine for CW-1 as well. CW-1 told me that on approximately six to eight occasions, CW-1 provided SOLE with an "eight ball" or one-eighth ounce quantity of methamphetamine, and SOLE reported back to CW-1 on the methamphetamine's quality. CW-1 does not know exactly how SOLE tested the methamphetamine. CW-1 stated that he/she did, however, observe SOLE purify "eight ball" quantities of methamphetamine by washing the drug with acetone. SOLE knew from CW-1 that CW-1 sold methamphetamine to others and that the tests SOLE performed for CW-1 on methamphetamine samples were in furtherance of CW-1's methamphetamine business.

10. CW-1 stated that in approximately January 2004, CW-1 observed SOLE appear to manufacture a gallon of GBL for CW-1 inside SOLE's apartment at 76 Waltham Street in Boston. (I say

4

"appear to manufacture" because CW-1 is not a chemist and therefore cannot say on the basis of his/her own knowledge alone that SOLE actually manufactured the GBL as opposed to starting out with a substance that was already GBL.) CW-1 stated that SOLE's apartment contained a great number of glass beakers, pipettes, and other equipment used in chemical laboratories. CW-1 said that SOLE used some of this equipment to produce the GBL. CW-1 knows that the substance was GBL in part because SOLE said it was GBL, and in part because CW-1 ingested some of the drug and recognized it as GBL. CW-1 gave SOLE cash and methamphetamine in exchange for the GBL. CW-1 stated that, over time, SOLE produced approximately three gallons of GBL for CW-1 and traded the GBL for methamphetamine and cash. SOLE knew from CW-1 that CW-1 sold GBL to customers, and she knew from CW-1 that some of the GBL she sold CW-1 would be distributed to others for consumption.

11. I also have received information about SOLE from a second cooperating witness ("CW-2") who has previously provided reliable information to law enforcement. CW-2's previously-provided information contributed to the indictment of another individual on federal drug trafficking charges. CW-2 has been charged in a federal drug trafficking case and is cooperating in the hopes of obtaining a reduced sentence. CW-2 has used and distributed a variety of drugs, including methamphetamine, GHB,

and GBL.

12. According to CW-2, SOLE told CW-2 that she worked at a company in Bedford and obtained GBL from the company by "signing out" one-half liter quantities at a time. SOLE told CW-2 that she mostly traded the GBL for methamphetamine. Beginning in early 2003, CW-2 began giving SOLE 3.5 gram quantities of methamphetamine in exchange for one-half liter quantities of GBL. When SOLE gave GBL to CW-2, she sometimes gave it to CW-2 in bulk, and she sometimes packaged it for resale in individual 1.6 ml Epindorf tubes, which she told CW-2 she had obtained from her workplace. SOLE told CW-2 that she had given liter quantities of GBL to others in the past, and CW-2 witnessed SOLE distribute single-dose quantities of GBL to others for their personal use.

13. CW-2 told me that from approximately November 2002 until approximately October 2003, CW-2 sold, on average, at least one ounce of methamphetamine each week. CW-2 stated that during most of this period SOLE was deeply involved in CW-2's methamphetamine business. For example, SOLE sometimes helped CW-2 weigh and package methamphetamine for resale; she sometimes communicated drug orders to him and made drug deliveries; and she and CW-2 together maintained a book at SOLE's residence documenting drug trades, sales, and other drug-related information.

14. CW-2 stated that SOLE also helped maintain "quality

control" by regularly testing methamphetamine for CW-2. SOLE performed some of these tests (i.e. chromatography, melting point) at her home and performed others (i.e. mass density) at work. SOLE sometimes showed CW-2 print-outs that she said were the results of mass spectrometric analysis of methamphetamine samples. SOLE told CW-2 that she tested methamphetamine for others as well.

15. Special Agent Michael Cashman of the DEA has spoken with a knowledgeable corporate official at SOLE's former place of employment, Applied Biosystems of Bedford, about SOLE's work and job responsibilities. The official told Special Agent Cashman that SOLE was employed by the company as a research chemist. The official also told Special Agent Cashman that company records show that between December 2002 and February 2004, SOLE ordered a total of 33 kilograms of GBL from chemical supply companies. SOLE also ordered 21 liters of 1.4-butanediol (BD), another GHB analog. The official told Special Agent Cashman that SOLE had no legitimate work-related reason to order those chemicals and did so without the company's knowledge, permission, or approval.

16. The Applied Biosystems official also told Special Agent Cashman that SOLE had access to a mass spectrometer at her place of work. This device, a Mariner Biospectrometry Workstation, requires the user to "log in" using a unique identifier each time the machine is used, and it maintains a record of the substance

that was analyzed. A search of the Workstation's records revealed that SOLE had used the machine over 100 times to analyze methamphetamine. The Applied Biosystems official informed Special Agent Cashman that SOLE had no legitimate work-related reason to analyze methamphetamine and did so without the company's knowledge, permission, or approval.

17. On March 10, 2004, I and other law enforcement agents and officers executed a search warrant at SOLE's residence at 76 Waltham Street, Apartment 5, Boston, Massachusetts. Among the items they found there were laboratory equipment and instructions for making GBL. SOLE was present during the search and was asked several times whether there were drugs in the house. At first she denied it, but then she brought the agents into the kitchen and pointed to several different containers of liquid. She said that she did not know what was in the containers but that it might be drugs. (The liquid in the containers was consistent with the appearance of GHB and/or GBL packaged in both single-dose and wholesale amounts.) SOLE said that she did not know where the containers had come from; she said that she had come home and simply found them on her kitchen counter. When SOLE was asked why she had so much laboratory glassware in her apartment, SOLE said that she was a chemist and simply liked glassware. SOLE said she did not think it was strange to keep laboratory glassware in her kitchen with her dishes.

18. A drug-sniffing dog was introduced to the residence and alerted to the presence of narcotics in the closet (among other places). When SOLE was asked whether there were drugs in the closet, she said that she did not know but that there were some boxes in the closet that did not belong to her. SOLE said that some people had left them there but she did not know what was in them. Among the items recovered from the closet were drug paraphernalia and drug packaging materials.

19. During the course of the search I told SOLE that she would be charged with selling GHB and methamphetamine. SOLE said that she never got money for GHB and that she never sold methamphetamine. I told SOLE that I thought she had a problem with methamphetamine and believed that she might have been trading GHB for methamphetamine. SOLE did not deny this but said that she did not think she had a problem with methamphetamine. Moments later SOLE said that perhaps she did have a problem and was in denial.

20. Based upon the foregoing, and based upon my training and experience, there is probable cause to believe that NURIA SOLE has knowingly and intentionally conspired to distribute, and to possess with intent to distribute, methamphetamine and GBL, in violation of 21 United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

I, having signed this affidavit under oath, as to all

assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

                                                SHAWN A. MURRAY
                                                Task Force Agent
                                                Drug Enforcement Administration

Sworn to before me on
this 22nd day of June, 2004.

CHARLES B. SWARTWOOD, III
UNITED STATES MAGISTRATE JUDGE